UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL** **'O'**

| | | | |
|---|---|---|---|
| Case No. | 2:26-cv-01671-CAS-KSx | Date | November 9, 2026 |
| Title | Jing Liu v. James Turco et al | | |

| | |
|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER |

| | | |
|---|---|---|
| Catherine Jeang | Amy Diaz | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| | |
|---|---|
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Rob Phillips<br>Shawn Sheehy | Shaina St. John, AUSA |

**Proceedings:** ZOOM HEARING RE: FEDERAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS (Dkt. 58, filed October 9, 2026)

## I. INTRODUCTION

On February 17, 2026, plaintiff Jing Liu ("Plaintiff") filed a complaint against James Turco; Margaret Cheng Turco; American Gateway Regional Centers, LLC ("AGRC"); 1875 N. Palm Canyon Gateway Partners I, LP ("Canyon Partners I"); 1875 N. Palm Canyon Gateway Partners II, LP ("Canyon Partners II"); JM Investment Group, LLC ("JMIG"); Kristi Noem, in her official capacity as Secretary of the Department of Homeland Security ("DHS"); Joesph B. Edlow, in his official capacity as the Director of the United States Citizenship and Immigration Services ("USCIS"); and Alissa Emmel, in her official capacity as the head of the Immigrant Investor Program at USCIS (collectively, "Defendants"). Dkt. 1 ("Compl."). Plaintiff asserts five claims for relief against James Turco, Margaret Cheng Turco, AGRC, Canyon Partners I, Canyon Partners II, and JMIG (collectively, the "Non-Federal Defendants"): (1) violations of 15 U.S.C. § 78j(b) and 17 C.F.R. §240.10b-5; (2) breach of fiduciary duty; (3) fraud in the inducement; (4) fraud; and (5) violation of California's Uniformed Limited Partnership Act. Id. ¶¶ 102-181. Plaintiff also asserts three Administrative Procedure Act ("APA") claims against Kristi Noem, Joeseph B. Edlow, and Alissa Emmel (collectively, the "Federal Defendants"), alleging: (6) failure to sanction the non-federal defendants for their failure to comply with annual statement filing requirements, pursuant to 8 U.S.C. § 1153(b)(2)(G)(iii)(I)-(II); (7) failure to sanction the non-federal defendants for their

failure to pay annual fees within 90 days of its due date, pursuant to 8 U.S.C. § 1153(b)(5)(J)(iv)(II); and (8) failure to timely inform plaintiff that an EB-5 regional center has been debarred and failure to provide plaintiff with 180 days to associate with another regional center to maintain her eligibility under the EB-5 program, pursuant to 8 U.S.C. § 1153(b)(5)(M)(i)-(iii). Id. ¶¶ 182-212.

On March 13, 2026, plaintiff filed an *ex parte* application for a temporary restraining order against the federal defendants. Dkt. 25 (“TRO App.”). Plaintiff’s application asked this Court to require the federal defendants and their successors, subordinates, agents, and assigns to recognize and maintain that plaintiff’s legal status and lawful presence in the United States remained in place from March 23, 2026, through and including April 27, 2026. Id. at 5. On March 20, 2026, the Court denied plaintiff’s application. Dkt. 27.

On October 9, 2026, the federal defendants filed the instant motion to dismiss. Dkt. 58 (“Mot.”). On October 19, 2026, plaintiff filed an opposition. Dkt. 59 (“Opp.”). On October 20, 2026, plaintiff filed a request for judicial notice. Dkt. 60 (“RJN”).[1] On October 26, 2026, the federal defendants filed a reply. Dkt. 61 (“Reply”).

On November 9, 2026, the Court held a hearing. Having carefully considered the parties’ arguments and submissions, the Court finds and concludes as follows.

## II. BACKGROUND

### A. EB-5 Visa Program

The gravamen of plaintiff’s claims against the federal defendants is that federal defendants have failed to take required action with respect to the EB-5 visa program. See Compl. ¶¶ 182-212. The EB-5 visa program sets forth a path to permanent residency for noncitizens who create U.S. jobs by investing in new commercial enterprises. See 8

[1] Plaintiff requests that the Court take judicial notice of two judgments issued by the California Superior Court in separate actions. See Dkt. 60. Plaintiff does not appear to oppose the request. See Reply. “Because the Court reaches its conclusions without relying on th[ese] documents,” the Court DENIES the request for judicial notice. See Chamber of Com. of United States v. California Air Res. Bd., 763 F. Supp. 3d 1005, 1015 n.6 (C.D. Cal. 2025).

U.S.C. § 1153(b)(5). The background of the EB-5 visa program is known to the parties and set forth in the Court's March 20, 2026 Order. Dkt. 27.

As relevant to the instant motion to dismiss, qualifying individuals can make EB-5 investments through a designated "regional center." See 8 U.S.C. § 1153(b)(5)(E). Given concerns that "the regional center program was susceptible to fraud and abuse," Congress enacted new requirements for regional centers as set forth in the EB-5 Reform and Integrity Act of 2022 (the "RIA"). See Consolidated Appropriations Act 2022, Pub. L. No. 117-103, div. BB, 136 Stat. 49, 1070-1109 (codified primarily at 8 U.S.C. § 1153(b)(5)(J), (M)); Behring Reg'l Ctr. LLC v. Mayorkas, No. 22-CV-02487, 2022 WL 2290594, at *2 (N.D. Cal. June 24, 2022).

The following provisions of Section 1153 and the RIA are relevant to the instant motion. First, Section 1153(b)(5)(G) sets forth the following requirements (the "Annual Statement Requirement"):

> (i) In general
>
> Each regional center designated under subparagraph (E) shall submit an annual statement, in a manner prescribed by the Secretary of Homeland Security.
>
> . . . .
>
> (iii) Sanctions
>
> (I) Effect of violation
>
> The Director shall sanction any regional center entity in accordance with subclause (II) if the regional center fails to submit an annual statement or if the Director determines that the regional center--
>
> (aa) knowingly submitted or caused to be submitted a statement, certification, or any information submitted pursuant to this subparagraph that contained an untrue statement of material fact . . .
>
> . . . .

(II) Authorized sanctions

The Director shall establish a graduated set of sanctions based on the severity of the violations referred to in subclause (I), including--

(aa) fines . . .

(bb) temporary suspension from participation in the program described in subparagraph (E) . . . .

(cc) permanent bar from participation in the program described in subparagraph (E) . . . and

(dd) termination of regional center designation.

8 U.S.C. § 1153(b)(5)(G)(i), (iii). Second, Section 1153(b)(5)(J) sets forth the following "Annual Fee" requirement:

(ii) Fees

(I) Annual fee

On October 1, 2022, and each October 1 thereafter, the Secretary of Homeland Security shall collect for the Fund an annual fee--

(aa) except as provided in item (bb), of $20,000 from each regional center . . . . .

. . . . .

(iv) Failure to pay fee

The Secretary of Homeland Security shall--

(I) impose a reasonable penalty . . . if any regional center does not pay the fee required under clause (ii) within 30 days after the date on which such fee is due; and

(II) terminate the designation of any regional center that does not pay the fee required under clause (ii) within 90 days after the date on which such fee is due.

8 U.S.C. § 1153(b)(5)(J)(ii), (iv). Third, Section 1153(b)(5)(M) sets forth the following "Good Faith Investor" provision:

(i) Termination or debarment of EB-5 entity

Except as provided in clause (vi), upon the termination or debarment, as applicable, from the program under this paragraph of a regional center . . .

(I) an otherwise qualified petition under section 1154(a)(1)(H) of this title or the conditional permanent residence of an alien who has been admitted to the United States pursuant to section 1186b(a)(1) of this title based on an investment in a terminated regional center . . . . shall remain valid or continue to be authorized . . . and

(II) the Secretary of Homeland Security shall notify the alien beneficiaries of such petitions of such termination or debarment.

(ii) New regional center or investment

The petition . . . of an alien . . . and the conditional permanent resident status of an alien . . . shall be terminated 180 days after notification of the termination from the program under this paragraph of a regional center . . . unless--

(I) in the case of the termination of a regional center--

. . . .

(bb) such alien makes a qualifying investment in another new commercial enterprise . . . .

8 U.S.C. § 1153(b)(5)(M)(i)-(ii).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL** **'O'**

| | | | |
|---|---|---|---|
| Case No. | 2:26-cv-01671-CAS-KSx | Date | November 9, 2026 |
| Title | Jing Liu v. James Turco et al | | |

**B. The Parties**

Having set forth background information related to the EB-5 visa program, the Court now turns to the complaint. Plaintiff alleges the following:

Plaintiff is an is a Chinese citizen who is lawfully present in the United States on an EB-5 investor visa. Compl. ¶ 17.

Defendant James Turco ("Mr. Turco") is the co-founder and president of AGRC. Id. ¶ 18. Defendant Margaret Cheng Turco ("Ms. Turco") is the co-founder and vice president of AGRC. Id. ¶ 19.

Defendant AGRC is a California limited liability company and a USCIS-approved EB-5 regional center. Id. ¶ 20. AGRC is approved to work in the following industries as an EB-5 regional center: accommodations, food services, professional offices, banking and insurance, retail trade, health club, assisted living, medical offices, and construction. Id. At all relevant times, AGRC is and was the general partner of defendant Canyon Partners I. Id.

Defendant Canyon Partners I is a California limited partnership. Id. ¶ 21.

Defendant Canyon Partners II is a California limited liability company. Id. ¶ 22. Mr. Turco is listed as the registered agent of Canyon Partners II. Id. The managing members of Canyon Partners II include defendant JMIG; 6770, LLC, managed by a Eugene Mui ("Mui"); and Baby Rhino I, LLC. Id. ¶¶ 22, 41.

Defendant JMIG is a California limited liability company. Id. ¶ 24. Mr. Turco and Ms. Turco (collectively, the "Turcos") own JMIG. Id. ¶ 22.

Defendant Markwayne Mullin is the Secretary of the Department of Homeland Security. See id. ¶ 25; Mot. at vi.[2]

Defendant Joseph B. Edlow is the Director of USCIS. Compl. ¶ 26.

[2] As stated in the federal defendants' motion to dismiss, Markwayne Mullin is automatically substituted as a defendant to this action in his official capacity, pursuant to Fed. R. Civ. P. 25(d).

Defendant Alissa Emmel is the head of the USCIS Immigrant Investor Program. Id. ¶ 26.

**C. Non-Federal Defendants' Alleged Conduct**

Plaintiff alleges the following:

1. The 1875 North Palm Canyon Property Purchase

In or around June 2013, the Turcos met a Christopher Rosas ("Rosas"), who had ten years of experience in the hotel industry and ran the operations of the Fusion Hotel and the Infusion Lounge in San Francisco, California. Id. ¶¶ 30, 35, 42. Rosas sought to expand the Infusion brand by creating another hotel in the Los Angeles and Palm Springs area (the "Infusion Beach and Hotel" or the "Project"). Id. ¶ 31. Rosas would act as president and direct the hotel's operations, development, and construction. Id. ¶ 35. Mui, who managed Canyon Partners II member 6770, LLC, would negotiate for the Infusion license, among other duties. Id. ¶ 34.

The owners of Canyon Partners II decided that the Turcos would be responsible for financing the project. Id. ¶ 34. In collaboration with AGRC, Canyon Partners I was to pool investor funding for the Infusion Beach and Hotel project. Id. ¶ 40. Next, Canyon Partners I was to loan money to Canyon Partners II, which would acquire and develop the property where Infusion Beach and Hotel would be located. Id. Accordingly, Mr. Turco effectively controlled both the lender, Canyon Partners I, and the borrower, Canyon Partners II, by serving as principal for both entities. Id. ¶ 23. Rosas would act as president and direct the hotel's operations, development, and construction. Id. ¶ 35.

In or around August 2013, Rosas found a hotel located at 1875 North Palm Canyon in Palm Springs, California (the "Property" or the "1875 North Palm Canyon Property"). Id. ¶ 33. In or around the fall of 2013, the owners of Canyon Partners II moved to acquire the property. See id. ¶¶ 34. 36. At or around the end of 2013, Rosas entered into an agreement to purchase the property. See id. ¶ 43. The agreement permitted the limited partnership to make payments over the course of eight months to complete the purchase of the property. Id. This arrangement was intended to provide time for the Turcos to raise capital from EB-5 investors. Id. Specifically, the plan was to raise $17 million from 34 foreign national investors who were seeking EB-5 visas. Id. ¶ 88. By

early 2014, however, the Turcos had not provided any financing to close on the property. Id. ¶ 45.

On August 1, 2014, Canyon Partners II closed on the 1875 North Palm Canyon property and paid $8,045,000. Id. ¶ 48. $4,400,000 was funded through a promissory note that encumbered the property. Id. ¶¶ 49, 51. The promissory note was issued by Canyon Partners II in favor of Private Mortgage Fund, LLC. Id. ¶ 49. The promissory note was dated July 30, 2014,[3] and signed by the Turcos in their capacities as co-managers of JMIG. Id. ¶ 50, Ex. L at 1. The annual interest rate on the note was 10.25%, which was well above the conventional interest rate of 4% to 5.5% for commercial loans in July 2014. Id.

The same day, Global Student Housing, LLC, an entity in which JMIG had a 35% stake, issued a second promissory note in the amount of $4,100,000 to the benefit of Private Mortgage Fund, LLC. Id. ¶ 52. This money was used to purchase a different hotel at a different location (the “Second Property”) for $4,100,000, resulting in a refund to Global Student Housing, LLC in the amount of $2,015,989.49. Id.

At the closing for the 1875 North Palm Canyon property, a deposit was made in the amount of $2,028,635.63 from the same escrow company that closed on the second property for Global Student Housing. Id. ¶ 54. This should have been marked as a loan to Canyon Partners II and not a deposit. Id.

Canyon Partners II then issued another promissory note in the amount of $2,550,000 to the benefit of Global Student Housing, LLC. Id. ¶ 54. This note also encumbered the 1875 North Palm Canyon property. Id. ¶ 55. Rosas signed this promissory note at the Turcos’ direction. Id. ¶ 54. The annual interest rate on this note was 12%. Id. As Mr. Turco explained to Rosas, the 12% interest rate was intended to allow Global Student Housing, LLC to “make a little bit of money . . . which makesee [sic] sense to USCIS.” Id. ¶ 57. Mr. Turco told Rosas, “This needs to be done before

[3] Elsewhere in the complaint, plaintiff alleges that the promissory note is dated December 2014. Compl. at 25 n.4. Plaintiff further alleges that the loan origination document states that the loan originated on August 1, 2014, and that the first payment was made the day prior. See id.

USCIS checks on us.” Id. Pursuant to this promissory note, Canyon Partners II was obligated to pay $35,000 a month to Global Student Housing, LLC. See ¶ 56.

In summary, approximately $6,428,635 of the $8,045,000 purchase price for the 1875 North Palm Canyon property was paid based on promissory notes secured by properties owned by the Turcos. Id. ¶ 58. Approximately $1,400,000 was paid through Canyon Partners II. Id.

Meanwhile, Canyon Partners II “suffered significant cash-flow problems, a problem exacerbated by the requirement to repay two loans exceeding $6 million.” Id. ¶ 59. In late December 2014, Rosas wired money from his own business to cover the hotel’s payroll expenses. Id.

By July 2015, the hotel was closed. Id. ¶ 61. By the end of 2015, Rosas left Canyon Partners II. Id. ¶ 60. By 2016, Mui—who managed Canyon Partners II member 6770, LLC—also left the project. See id. ¶ 62.

2. Rosas’s Conduct

Mr. Turco has described the following conduct as “fraud” on the part of Rosas. Id. ¶ 65.

Between April and July of 2014, Rosas took more than $350,000 in Canyon Partners II’s funds and moved that money into an account that was under his control. Id. ¶ 66. According to Mr. Turco, Rosas made these transfers without permission and without informing anyone. Id.

On August 4, 2014, Rosas made a promissory note in the amount of $347,500 wherein Rosas was the borrower and Canyon Partners II was the lender. Id. ¶ 67. This appears to have been done without Mr. Turco’s knowledge or consent, and it is unclear whether the funds were repaid. Id.

On January 8, 2015, Rosas secretly transferred $250,000 from Canyon Partners II’s bank account to his personal account without permission and without authorization. Id. ¶ 68.

3. AGRC's Purchase of a Private Residence

In September 2018, AGRC, on information and belief, used investor funds to purchase a private residence located in Newport Beach, California for approximately $2 million. Id. ¶¶ 70-71. This was not a legitimate business expense because USCIS never approved AGRC to purchase and redevelop residential property. Id. ¶ 72. Fourteen months later, AGRC conveyed the private residence to the Turcos personally. Id. ¶ 73.

**D. Plaintiff's Alleged Investments in AGRC and JMIG**

Plaintiff alleges the following:

In March 2014, plaintiff received a Confidential Private Offering Memorandum (the "Memorandum") associated with "1875 N Palm Canyon Gateway Partners I, LP"" from her immigration attorney. Id. ¶ 75; see also id. Ex. B., Ex. C. The memorandum explained that the project would involve the conversion of a hotel property located at 1875 North Palm Canyon in Palm Springs, California. Id. ¶ 76. The memorandum explained that AGRC, Canyon Partners I, Canyon Partners II, Mr. Turco, and Mui would be involved in the project. See id. ¶¶ 76-77. Rosas's name appeared nowhere in the memorandum, despite his role as president. Id. ¶ 81.

On May 19, 2015, plaintiff made a $550,000 investment in Canyon Partners I. Id. ¶¶ 78, 88. Because the investment was located in a targeted employment area, plaintiff only needed to invest $500,000 under the EB-5 visa program. Id. ¶ 89.

Plaintiff was never informed (a) of Rosas's possible fraud; (b) of Canyon Partners II's significant cashflow problems and major construction delays stemming therefrom; (c) that the 1875 North Palm Canyon property was twice encumbered on promissory notes; (d) that above market interest rates benefitted another project that the Turcos controlled; or (e) that Mui had left the project, which required a rebranding of the hotel since Mui could no longer license the Infusion brand to the hotel project. See id. ¶¶ 63, 76-84, 87. All of these omissions materially increased the risk associated with Ms. Liu's investment. See id. ¶¶ 63, 86.

In April 2018, Ms. Turco stated that additional investment was urgently needed to preserve the project and personally asked plaintiff for an additional investment of $100,000. See id. ¶¶ 69, 75, 92. Ms. Turco did not disclose concerns related to Rosas's

alleged fraud or the loss of the Infusion brand. Id. ¶ 93. Based on these representations, plaintiff invested an additional $100,000 in JMIG. Id. ¶ 94.

In April 2020, plaintiff received an email from Ms. Turco informing investors of an urgent need to obtain a loan, which required Ms. Turco and Canyon Partners I to raise $1,000,000 from investors. Id. ¶ 95. Again, Ms. Turco failed to disclose to plaintiff any of the above concerns, including the fact that there were lawsuits filed in 2018 containing numerous allegations of fraud. Id. ¶ 96.

When plaintiff asked for annual financial statements and her K-1 tax return, the Turcos, through telephone calls and electronic communications, told plaintiff that (1) she was not entitled to the financial documents; (2) that the documents would be provided to her for a fee; and/or (3) that other documents, such as promotional materials, would satisfy the request for financial documents. Id. ¶ 113.

The only financial document that plaintiff received in her ten years as an investor in Canyon Partners I was her 2023 Schedule K-1 tax return. Id. ¶ 97. She received this K-1 tax return on July 12, 2024, more than nine years after her initial investment. Id. The K-1 tax return shows that on both January 1, 2023, and on December 31, 2023, Ms. Liu's partnership account had $499,499 in the account. Id. ¶ 98. On information and belief, the Turcos moved money from accounts they controlled into Ms. Liu's operating account at the right moment to be captured on the K-1 tax return. Id. ¶ 100.

### E. AGRC's EB-5 Requirements and Federal Defendants' Alleged Conduct

Plaintiff alleges the following:

As an EB-5 regional center, AGRC is required to submit financial documents to USCIS on an annual basis. See id. ¶ 187 (citing 8 U.S.C. 1153(b)(2)(G)(i)). Accordingly, AGRC was required to disclose (a) a description of all litigation and bankruptcy proceedings that involved AGRC, Canyon Partners I, and Canyon Partners II; (b) an accounting of all individual investor capital invested in AGRC, Canyon Partners I, and Canyon Partners II, and (c) a description of how investor capital "is being used to execute each capital investment project," and (d) evidence that "100 percent of the capital . . . has been committed to each capital investment project." Id. ¶¶ 188-189 (citing 8 U.S.C. § 1153(b)(2)(G)(i)(VI)). On information and belief, the non-federal defendants never made these disclosures and failed to file at least one annual statement. Id. ¶¶ 190,

210. If non-federal defendants did file the required documents, on information and belief, those documents omitted details about (a) filed litigation containing allegations of fraud and (b) Canyon Partners II's filing for bankruptcy in October 2020. Id. ¶¶ 191-193. Upon information and belief, federal defendants have not issued sanctions on AGRC for failing to make these disclosures or for filing statements that contained materially false statements. Id. ¶¶ 196-199 (citing 8 U.S.C. § 1153(b)(5)(G)(iii)(I), (II)).

Upon information and belief, non-federal defendants failed to pay annual fees pursuant to 8 U.S.C. § 1153(b)(5)(J)(ii)(I). See id. ¶ 202.

Plaintiff was unaware of the "fraud, abuse and malfeasance" committed by non-federal defendants. Id. ¶ 206. She never received financial statements, annual statements, tax returns (with the exception of the 2023 tax return), or an updated Memorandum. Id. Due to federal defendants' failure to debar and terminate non-federal defendants and their failure to subsequently notify plaintiff, federal defendants failed to provide plaintiff with an opportunity to affiliate with another regional center to maintain her eligibility under the EB-5 program. Id. ¶ 209 (citing 8 U.S.C. § 1153(b)(5)(M)(i)-(ii)).

AGRC is still a recognized regional center. Id. ¶ 211.

## III. LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(1)

A motion pursuant to Federal Rule of Civil Procedure 12(b)(1) raises the objection that the federal court has no subject matter jurisdiction over the action. This defect may exist despite the formal sufficiency of the allegations in the complaint. T.B. Harms Co. v. Eliscu, 226 F. Supp. 337, 338 (S.D.N.Y. 1964), aff'd, 339 F.2d 823 (2d Cir. 1964). When considering a Rule 12(b)(1) motion challenging the substance of jurisdictional allegations, the Court is not restricted to the face of the pleadings, but may review any evidence, such as declarations and testimony, to resolve any factual disputes concerning the existence of jurisdiction. See McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988).

Once a Rule 12(b)(1) motion has been raised, the burden is on the party asserting jurisdiction. Sopcak v. N. Mountain Helicopter Serv., 52 F.3d 817, 818 (9th Cir. 1995); Ass'n of Am. Med. Coll. v. United States, 217 F.3d 770, 778-79 (9th Cir. 2000). If

jurisdiction is based on a federal question, the pleader must show that he has alleged a claim under federal law and that the claim is not frivolous. See 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1350 at 211, 231 (3d ed. 2004).

**B. Federal Rule of Civil Procedure 12(b)(6)**

A motion pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in a complaint. Under this Rule, a district court properly dismisses a claim if “there is a ‘lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.’” Conservation Force v. Salazar, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting Balisteri v. Pacifica Police Dep’t, 901 F.2d 696, 699 (9th Cir. 1988)). “While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff’s obligation to provide the ‘grounds’ of his ‘entitlement to relief’ requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.” Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). “[F]actual allegations must be enough to raise a right to relief above the speculative level.” Id.

In considering a motion pursuant to Rule 12(b)(6), a court must accept as true all material allegations in the complaint, as well as all reasonable inferences to be drawn from them. Pareto v. FDIC, 139 F.3d 696, 699 (9th Cir. 1998). The complaint must be read in the light most favorable to the nonmoving party. Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001). However, “a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.” Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); see Moss v. United States Secret Service, 572 F.3d 962, 969 (9th Cir. 2009) (“[F]or a complaint to survive a motion to dismiss, the non-conclusory ‘factual content,’ and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief.”). Ultimately, “[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.” Iqbal, 556 U.S. at 679.

As a general rule, leave to amend a complaint that has been dismissed should be freely granted. Fed. R. Civ. P. 15(a). However, leave to amend may be denied when “the court determines that the allegation of other facts consistent with the challenged pleading

could not possibly cure the deficiency." Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986).

## IV. DISCUSSION

Federal defendants bring the instant motion to dismiss pursuant to Rule 12(b)(1), arguing that the court lacks jurisdiction over plaintiff's claims because (1) the claims are not subject to judicial review, pursuant to 5 U.S.C. § 701(a); (2) there is no "final agency action," pursuant to 5 U.S.C. § 704; (3) plaintiff lacks standing; and (4) 8 U.S.C. § 1252(g) strips the Court's jurisdiction over plaintiff's eighth claim. See Mot. Federal defendants also bring their motion to dismiss pursuant to Rule 12(b)(6), arguing that plaintiff fails to state a claim. See id.

### A. Jurisdictional Challenges

First, the Court considers the federal defendants' arguments that plaintiff's claims are not subject to judicial review under the APA.[4] Second, the Court considers whether 8

[4] Defendants make these arguments in support of their Rule 12(b)(1) motion to dismiss. However, the Ninth Circuit has not clearly established whether the question of reviewability under 5 U.S.C. § 701(a) is a jurisdictional question best resolved on a Rule 12(b)(1) motion, or whether it is appropriately resolved on a Rule 12(b)(6) motion. See Doe 1 v. Mayorkas, 530 F. Supp. 3d 893, 906 (N.D. Cal. 2021) (finding, in the absence of clear guidance, that a Section 701(a) challenge was jurisdictional). But see Sierra Club v. Jackson, 648 F.3d 848, 854 (D.C. Cir. 2011) ("[A] complaint seeking review of agency action 'committed to agency discretion by law,' 5 U.S.C. § 701(a)(2), has failed to state a claim under the APA, and therefore should be dismissed under Rule 12(b)(6), not under the jurisdictional provision of Rule 12(b)(1)."). Moreover, with respect to the federal defendants' Section 704 arguments, the Ninth Circuit has stated that "the fact that an agency decision is not final under the APA is not a defect in subject matter jurisdiction." Idaho Watersheds Project v. Hahn, 307 F.3d 815, 830 (9th Cir. 2002). However, the Ninth Circuit has also suggested that Section 704 challenges are properly entertained pursuant to Rule 12(b)(1). See, e.g., Prutehi Litekyan: Save Ritidian v. United States Dep't of Airforce, 128 F.4th 1089, 1107 (9th Cir. 2025), cert. granted sub nom. Dep't of the Air Force v. Prutehi Guahan, 146 S. Ct. 1794 (2026). In any event, the Court need not resolve these questions because the parties' Section 701 and Section 704 arguments result in the same outcome regardless of whether Rule 12(b)(1) or Rule 12(b)(6) applies.

U.S.C. § 1252(g) strips the Court of jurisdiction with respect to plaintiff's eighth claim for relief.

1. Section 701(a)(2)

The federal defendants argue that dismissal is appropriate because plaintiff challenges the federal defendants' discretionary enforcement decisions, which are not subject to judicial review under the APA. Mot. at 9-11 (citing Heckler v. Chaney, 470 U.S. 821, 831, 837-38 (1985)). Specifically, the federal defendants argue that Chaney bars plaintiff's claims "based on USCIS's alleged failure to enforce sanctions or debarment against the non-federal defendant(s) based on their purported failure to file annual statements or pay annual fees, and USCIS's subsequent failure to notify her of such sanction or debarment." Id. at 11.

In opposition, plaintiff argues that "[Chaney] applies only where statutes vest such broad discretion that there is no law to apply." Opp. at 22. Plaintiff further argues that Chaney sets forth a narrow exception to the APA's presumption of judicial review. Id. Plaintiff argues that the federal defendants "do not have unfettered discretion" under the relevant statutory provisions. Id. at 23. Accordingly, plaintiff argues that "this Court can determine whether the [f]ederal [d]efendants complied with the statutory commands." Id. at 23.

In reply, the federal defendants argue that plaintiff "misreads" Chaney, which established that "an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)." Reply at 9 (quoting Chaney, 470 U.S. at 832). The federal defendants argue that this presumption is rebutted only where "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." Id. (quoting Chaney, 470 U.S. at 832). The federal defendants argue that plaintiff has failed to plead any such guidelines here. Id. Additionally, the federal defendants argue that the statutory provisions on which plaintiff relies are "classic enforcement discretion provisions." Id. The federal defendants argue that because plaintiff failed to "substantively address the arguments on this point in her [o]pposition[,] she has thus conceded such arguments." Id. at 10.

In general, there is a "strong presumption that Congress intends judicial review of administrative action." Pinnacle Armor, Inc. v. United States, 648 F.3d 708, 718 (9th Cir. 2011) (quoting Helgeson v. Bureau of Indian Affs., 153 F.3d 1000, 1003 (9th Cir.

1998)). “This presumption is overcome only in two narrow circumstances. The first, which is not at issue here, is when Congress expressly bars review by statute,” pursuant to 5 U.S.C. § 701(a)(1). Id. The second exception, pursuant to 5 U.S.C. § 701(a)(2) (“Section 701(a)(2)”), applies in “‘those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply,’ thereby leaving the court with ‘no meaningful standard against which to judge the agency's exercise of discretion.’” Id. (quoting Webster v. Doe, 486 U.S. 592, 599 (1988) and Chaney, 470 U.S. at 830). Courts interpret Section 701(a)(2)’s exception “quite narrowly.” Perez Perez v. Wolf, 943 F.3d 853, 860 (9th Cir. 2019) (quoting Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv., 586 U.S. 9, 23 (2018)).

As relevant here, “an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2).” Chaney, 470 U.S. at 832. However, the presumption may be rebutted by “proof that Congress intended to limit an agency's enforcement discretion, ‘either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue.’” Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist., 952 F.2d 1173, 1176 (9th Cir. 1992) (quoting Chaney, 470 U.S. at 833).

“In determining whether judicial review is precluded on § 701(a)(2) grounds, we consider ‘the language of the statute and whether the general purposes of the statute would be endangered by judicial review.’” Pinnacle, 648 F.3d at 719 (quoting Cnty. of Esmeralda v. Dep't of Energy, 925 F.2d 1216, 1218 (9th Cir. 1991)). Courts may also consider “regulations, established agency policies, or judicial decisions.” Id. (quoting Mendez-Gutierrez v. Ashcroft, 340 F.3d 865, 868 (9th Cir. 2003)).

The Court looks first to the annual statement and the annual fee requirements. With respect to the annual statement requirement, Section 1153(b)(5)(G)(i) provides that the Director “*shall* sanction any regional center entity” if either “the regional center fails to submit an annual statement” or “if the Director determines that the regional center . . . knowingly submitted or caused to be submitted” a submission containing an “untrue statement of material fact.” 8 U.S.C. § 1153(b)(5)(G)(i) (emphasis added). With respect to the annual fee requirement, Section 1153(b)(5)(J)(iv) provides that the Secretary of Homeland Security “*shall*” apply “a reasonable penalty . . . if any regional center does not pay the fee . . . within 30 days” of its due date, or “terminate the designation of any

regional center that does not pay the fee . . . within 90 days” of its due date. Id. § 1153(b)(5)(J)(iv) (emphasis added).

The relevant regulations provide that “USCIS will issue a notice of intent to terminate the designation of a regional center in the program if . . . a regional center fails to submit the information required [annually] . . . . ; or . . . USCIS determines that the regional center no longer serves the purpose of promoting economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment.” 8 C.F.R. § 204.6(m)(6)(ii). Additional regulations state that monetary penalties “will be imposed” on regional centers who do not timely pay the annual fee. 8 C.F.R. § 106.2(d)(10)(ii)(A)-(B). Regulations further state that USCIS “will terminate the designation” of a regional center if the regional center fails to pay the fee and any applicable penalties within 90 days of the fee’s due date. See id. § 106.2(d)(10)(ii)(C).

To the extent that the annual statement and annual fee requirements concern the agency’s enforcement decisions,[5] the Court starts with the presumption that the USCIS’s decisions not to enforce these requirements are unreviewable. See Cheney, 470 U.S. at 832-33. The Court then asks whether the relevant statutory and regulatory language cabin USCIS’s prosecutorial discretion. See id. at 832-333. On the one hand, both requirements include mandatory language. “The word ‘will,’ like the word ‘shall,’ is a mandatory term, unless something about the context in which the word is used indicates otherwise.” Cf. Vaz v. Neal, 33 F.4th 1131, 1136 (9th Cir. 2022) (quoting Nat. Res. Def. Council, Inc. v. Perry, 940 F.3d 1072, 1078 (9th Cir. 2019)) (discussing judicial review pursuant to 5 U.S.C. § 706(1)); see also Sierra Club v. Jackson, 648 F.3d 848, 856 (D.C. Cir. 2011) (“‘[S]hall’ is usually interpreted as “the language of command.” (citation modified)). Accordingly, the fact that USCIS, DHS, and its personnel “shall” and “will” impose sanctions suggests that the statutory and regulatory scheme cabins the agency’s enforcement discretion with respect to the annual statement and annual fee requirements. See 8 U.S.C. § 1153(b)(5)(G)(i); id. § 1153(b)(5)(J)(iv); 8 C.F.R. § 204.6(m)(6)(ii); id. §

[5] Although not entirely clear from the briefing, the parties do not appear to dispute that the annual statement and annual fee requirements implicate the agency’s enforcement decisions. Instead, the parties focus their dispute on the degree of discretion that the statutes confer with respect to those enforcement decisions. See Mot. at 9-11; Opp. at 22-24.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL** **'O'**

| Case No. | 2:26-cv-01671-CAS-KSx | Date | November 9, 2026 |
|---|---|---|---|
| Title | Jing Liu v. James Turco et al | | |

106.2(d)(10)(ii). In other words, the mandatory language provides an "indication that violators must be pursued in every case." Cf. Irritated Residents, 494 F.3d at 1033 (observing that the relevant statutes' permissive language did not "give any indication that violators must be pursued in every case, or that one particular enforcement strategy must be chosen over another"). At the very least, this statutory and regulatory scheme distinguishes cases in which an agency "*may*" impose penalties and therefore retains discretion by law. See, e.g., City & Cnty. of San Francisco v. U.S. Dep't of Transp., 796 F.3d 993, 1002-03 (9th Cir. 2015) (emphasis added) (finding that judicial review is not permitted where an agency "may" reject a certification "if" the Secretary makes certain findings); Irritated Residents, 494 F.3d at 1032-33 (finding that Section 702(a)(2) barred judicial review where "the Administrator 'may' issue compliance orders, 'may' assess administrative penalties, and 'may' sue in court to assess and collect a penalty.").

However, the presence of mandatory language is not necessarily sufficient to rebut the presumption that an agency's non-enforcement decision is unreviewable. See Sisseton-Wahpeton Oyate of Lake Traverse Rsrv. v. U.S. Corps of Eng'rs, 888 F.3d 906, 916 (8th Cir. 2018) ("The mere use of the word 'shall' in a statute 'does not preclude the exercise of prosecutorial discretion' by the agency."). For example, in Cheney, a portion of the relevant statute provided that those who violate the statute's substantive prohibitions "shall be imprisoned . . . or fined." See Cheney, 470 U.S. at 835. Despite the statute's use of the word "shall," the Supreme Court was "unwilling to attribute such a sweeping meaning to this language," since other portions of the statute merely "authorized" the agency's secretary to conduct investigations and recommend prosecution. See id. Accordingly, the Supreme Court held that non-enforcement decisions under the statute were unreviewable, given that "[t]he [a]ct's enforcement provisions . . . commit complete discretion to the Secretary to decide how and when they should be exercised." Id.

In contrast, in Cook v. FDA, the D.C. Circuit held that certain FDA non-enforcement decisions were reviewable under a statute that provided that the FDA "shall request" samples of drugs, and "if it appears from the examination of such samples or otherwise" that the drug violates a substantive prohibition of the statute, then the drug "shall be refused admission." Cook v. FDA, 733 F.3d 1, 7 (D.C. Cir. 2013). The D.C. Circuit distinguished Cheney by noting that the statute in Cheney did not include the word "'shall' in connection with the antecedent condition in prosecution." Id. In contrast, in Cook, "the word 'shall' appears in both an antecedent ('shall request . . .

samples’) and the consequent (‘shall be refused admission’).” Id. at 8. The Court further explained that the “if it appears” statutory language implies that “the FDA must examine the samples that it must request and determine whether they appear to violate” the statute. Id. Similarly, in Dunlop v. Bachowski, 421 U.S. 560 (1975), the Supreme Court observed that judicial review of prosecutorial discretion was appropriate under a statute that provided that “[t]he Secretary *shall* investigate such complaint and, if he finds probable cause to believe that a violation of this subchapter has occurred and has not been remedied, he *shall* . . . bring a civil action.” 421 U.S. at 563 n.2, 567 n.7 (emphasis added).

Here, the relevant statutory and regulatory language appears to fall somewhere between Cheney on the one hand and Cook and Dunlop on the other. Unlike in Cheney, the relevant statutes and regulations do not contain permissive language with respect to the agency’s authority to enforce (or not enforce) the annual statement or annual fee requirements. However, unlike in Cook and Dunlop, there is no “shall” language associated with an antecedent to enforcement.

The Court ultimately concludes that judicial review is appropriate with respect to the federal defendants’ authority to (1) sanction a regional center if it “fails to submit an annual statement,” pursuant to 8 U.S.C. § 1153(b)(5)(G)(i); and (2) “impose a penalty” or “terminate the designation” of any regional center that does not timely pay the annual fee, pursuant to 8 U.S.C. § 1153(b)(5)(J)(iv). With respect to these enforcement decisions, “[t]he Court sees no language within [the relevant provisions] which would allow Defendant . . . to decline” to impose the specified sanctions. See Stenson Tamaddon, LLC v. U.S. Internal Revenue Serv., 742 F. Supp. 3d 966, 986-87 (D. Ariz. 2024) (finding that an IRS moratorium on processing refunds, construed as an “optional non-enforcement decision,” was subject to judicial review). Accordingly, the Court finds that Section 701(a)(2) does not bar judicial review of plaintiffs’ claims pursuant to these provisions.[6]

[6] The federal defendants’ cited authority does not compel a different conclusion. See Mot. at 10-11. As noted above, City & Cnty. of San Francisco v. U.S. Dep't of Transp., 796 F.3d 993 (9th Cir. 2015), involved discretionary statutory language that finds no analogue in the statutes and regulations that apply here. See 796 F.3d at 1002. Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle, 829 F.2d 933, 938 (9th Cir.

However, with respect to statutory language providing that the Director “shall sanction any regional center entity if the Director determines that the regional center knowingly submitted or caused to be submitted” a submission containing an “untrue statement of material fact,” judicial review is not appropriate. 8 U.S.C. § 1153(b)(5)(G)(iii)(I)(aa) (citation modified). While this provision states that the Director “shall” impose sanctions, the imposition of those sanctions is conditional on the Director’s determination that a regional center has violated the statute’s substantive mandates. Cf. Stenson, 742 F. Supp. 3d at 987 (finding judicial review appropriate where there was no “conditional language” encumbering “the discretion of [d]efendant”). With respect to that conditional finding, the statute does not “constrain [the agency’s] discretion whether to make th[e] legal determinations in the first instance.” See Citizens for Resp. & Ethics in Washington v. Fed. Election Comm’n, 892 F.3d 434, 439 (D.C. Cir. 2018) (finding that “sections directing that the Commission ‘shall’ take specific actions after making certain threshold legal determinations” did not warrant judicial review). In other words, the federal defendants retain full discretion to initiate or decline to initiate any investigation or enforcement proceedings with respect to “untrue statement[s] of material fact.” “The consequence is that the operative ‘statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.’” Id. (quoting Chaney, 470 U.S. at 830).

---

1987), and Ctr. for Biological Diversity v. Army Corps of Eng'rs, No. CV 14-1667, 2014 WL 12923196 (C.D. Cal. Sept. 26, 2014), similarly involved distinguishable statutory provisions that granted “discretionary enforcement powers” to the defendant. Dunkle, 829 F.2d at 938; Ctr. for Biological Diversity, 2014 WL 12923196 at *6. In Port of Seattle, Wash. v. FERC, 499 F.3d 1016 (9th Cir. 2007), the Ninth Circuit found that review was appropriate because the defendants had already initiated enforcement proceedings, rendering the relevant question not about non-enforcement but about the appropriate resolution to a dispute. 499 F.3d at 1027. Finally, Anderson v. Cardona, No. 520CV01824, 2021 WL 6423804, at *4 (C.D. Cal. Nov. 4, 2021), and Hegland v. Hanna, No. 2:19-CV-04492, 2019 WL 7906428, at *1 (C.D. Cal. Nov. 4, 2019), dealt with quintessential questions of prosecutorial discretion, including an agency’s decision not to investigate a civil rights complaint and a prosecutor’s decision not to bring certain individuals before a grand jury. Accordingly, the Court finds these authorities unpersuasive.

Finally, with respect to the good faith investor provision, plaintiff does not appear to allege that federal defendants failed to *enforce* the provision but instead alleges that federal defendants failed to *provide certain benefits* set forth in Section 1153(b)(5)(M)(i)(II). See 8 U.S.C. § 1153(b)(5)(M)(i)-(ii) (stating that "the Secretary of Homeland Security shall notify" EB-5 beneficiaries of the termination or debarment of their regional center and that an otherwise qualified beneficiary's status "shall remain valid" for 180 days after notification); Compl. ¶¶ 208-209. Accordingly, the Court declines to apply the Cheney presumption against reviewability for enforcement decisions. See Cheney, 470 U.S. at 832-33. Assuming *arguendo* that this provision requires the agency to provide notice upon a regional center's termination or debarment, "[t]he only 'discretionary' act remaining is the timing of implementation." Padilla Constr. Co. v. Acosta, No. CV 18-1214, 2022 WL 1599717, at *20 (C.D. Cal. Mar. 25, 2022). In such circumstances, courts in the Ninth Circuit find that the factors governing unreasonable delay as set forth in Telecommunications Rsch. & Action Ctr. v. F.C.C. ("TRAC"), 750 F.2d 70 (D.C. Cir. 1984), provide "meaningful standards" and "law to apply." See, e.g., Padilla Constr. Co. v. Acosta, No. CV 18-1214, 2022 WL 1599717, at *20 (C.D. Cal. Mar. 25, 2022); Zafarmand v. Pompeo, No. 20-CV-00803, 2020 WL 4702322, at *6 (N.D. Cal. Aug. 13, 2020). Accordingly, the Court finds that judicial review is appropriate with respect to plaintiff's claims pursuant to 8 U.S.C. § 1153(b)(5)(M)(i)(II).[7]

[7] The Court declines to adopt the federal defendants' suggestion that plaintiff has "conceded" the issue of reviewability under Section 701(a)(2). See Reply at 9-10. The fact that plaintiff did not distinguish each of the federal defendants' cited authorities does not amount to a "failure to respond" to federal defendants' arguments. See id.; cf. Ball v. Pechanga Econ. Dev. Corp., 2023 WL 12333019, at *2 (C.D. Cal. Apr. 20, 2023) (finding that a party conceded arguments where he "wholly fail[ed] to respond to any of the arguments" raised by the opposing party's motion). Instead, plaintiff's opposition sets forth her alternative interpretation and application of Cheney and argues that the relevant statutes do not provide the agency with "unfettered [enforcement] discretion." See Opp. at 23. Accordingly, the Court declines to construe plaintiff's opposition as a concession.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL** **'O'**

| Case No. | 2:26-cv-01671-CAS-KSx | Date | November 9, 2026 |
|---|---|---|---|
| Title | Jing Liu v. James Turco et al | | |

2. Section 704

The federal defendants argue that judicial review of plaintiff's APA claims is not appropriate because plaintiff "fails to allege any final agency action." Mot. at 11. "To the contrary, she alleges *inaction*." Id. (emphasis in original).

In opposition, plaintiff argues that "the APA permits lawsuits challenging agency inaction." Opp. at 24. Plaintiff observes that "[f]ailure to act means that the agency failed to issue a 'rule, order, license, sanction, or relief.'" Id. (quoting Norton v. S. Utah Wilderness All. ("SUWA"), 542 U.S. 55, 62 (2004)).

In reply, the federal defendants argue that plaintiff's claims do not qualify as a "rule, order, license, sanction, or relief." Reply at 12. The federal defendants further argue that plaintiff cannot "evade the finality requirement of the APA with complaints about the sufficiency of an agency action 'dressed up as an agency's failure to act.'" Id. (citation modified) (quoting Ecology Ctr., Inc. v. U.S. Forest Serv., 192 F.3d 922, 926 (9th Cir. 1999)). Finally, the federal defendants argue that "separation-of-powers principles preclude courts from 'compel[ling] agency action merely because the agency is not doing something [the court] may think it should do.'" Id. (quoting Zixiang Li v. Kerry, 710 F.3d 995, 1004 (9th Cir. 2013)).

Pursuant to Section 704, courts may review "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. With respect to agency *inaction*, "[a] court's review of an agency's failure to act has been referred to as an exception to the final agency action requirement" pursuant to 5 U.S.C. § 706(1) ("Section 706(1)"). See ONRC Action v. Bureau of Land Mgmt., 150 F.3d 1132, 1137 (9th Cir. 1998); Ecology Ctr., 192 F.3d at 926 ("Courts have permitted jurisdiction under the limited exception to the finality doctrine only when there has been a genuine failure to act."). The parties address the applicability of Section 706(1) in connection with federal defendants' motion to dismiss for failure to state a claim. Accordingly, for the purposes of the federal defendants' Section 704 jurisdictional challenge, the Court assumes without deciding that the inaction exception to Section 704's final agency action requirement applies, and it declines to find that Section 704 bars judicial review of the alleged inaction.

3. 8 U.S.C. § 1252(g)

The federal defendants argue that plaintiff's eighth claim is barred by 8 U.S.C. § 1252(g) (“Section 1252(g)”), which strips the district court's jurisdiction “over claims seeking to delay removal pending another process that will allegedly stop a removal.” Mot. at 15. Federal defendants argue that “[t]o the extent the noncitizen may wish to block or stay enforcement of removal, they are . . . obliged to do so in the Immigration Court process and its appeals process.” Id. at 16. The federal defendants argue that because “[p]laintiff's Claim VIII effectively seeks for this Court to stay or void her removal proceedings,” it is barred by Section 1252(g). Id. at 14-15.

In opposition, plaintiff argues that Section 1252(g) “has nothing to do with this case.” Opp. at 28. Plaintiff argues that she is “not in removal proceedings nor is there an order for her removal,” so Section 1252(g) does not apply. Id. at 28-29.

In reply, the federal defendants argue that plaintiff brings her claim with respect to the good faith investor provision “so that she can maintain her legal status in the United States under the EB-5 program.” Reply at 15 (quoting Compl. ¶ 212). Accordingly, the federal defendants argue that plaintiff “directly is asking the Court to take action to order the agency to change her status to impact her ability to obtain immigration benefits.” Id.

Section 1252(g) “limits review of cases ‘arising from’ decisions ‘to commence proceedings, adjudicate cases, or execute removal orders.’” Dep't of Homeland Sec. v. Regents of the Univ. of California, 591 U.S. 1, 19 (2020). The scope of section 1252(g) is “narrow.” See Ibarra-Perez v. United States, 154 F.4th 989, 996 (9th Cir. 2025) (quoting Reno v. American-Arab Anti–Discrimination Comm. (“AADC”), 525 U.S. 471, 487 (1999)). “Instead of ‘sweep[ing] in any claim that can technically be said to ‘arise from’ the three listed actions,’ the provision ‘refer[s] to just those three specific actions themselves.’” Id. (quoting Jennings v. Rodriguez, 583 U.S. 281, 294 (2018) (plurality opinion)). “‘There are of course many . . . decisions or actions that may be part of the deportation process’ not implicated by § 1252(g), ‘such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order.’” Id. (quoting AADC, 525 U.S. at 482). Indeed, the Supreme Court has “rejected as ‘implausible’ the . . . suggestion that § 1252(g) covers ‘all claims arising from deportation proceedings’ or imposes ‘a general jurisdictional limitation.’” Id. (quoting AADC, 525 U.S. at 482).

The federal defendants do not appear to argue that plaintiff's eighth claim challenges the Attorney General's decision to "commence proceedings," "adjudicate cases," or "execute removal orders." Instead, the federal defendants appear to argue that plaintiff's claim falls within the scope of Section 1252(g) because she ultimately seeks relief with respect to her immigration status. See Reply at 15. In this respect, the federal defendants' cited authority is inapposite, given that "[t]he execution of [petitioner's] removal order is precisely what [petitioner] challenge[d]" in that case. Rauda v. Jennings, 55 F.4th 773, 777 (9th Cir. 2022) (affirming that Section 1252(g) stripped the district court's jurisdiction to adjudicate petitioner's request to enjoin his removal).

The Court does not see how plaintiff's eighth claim—which seeks to compel the federal defendants to provide her with notice and an opportunity to re-invest in another regional center, see Compl. ¶ 212—can be construed as "commenc[ing] proceedings," "adjudicat[ing] cases" or "execu[ting] removal orders" within the meaning of Section 1252(g). The Ninth Circuit has "been clear that § 1252(g) does not prohibit challenges to unlawful practices merely because they are in some fashion connected to removal orders." Ibarra-Perez, 154 F.4th at 997. Accordingly, the Court finds that Section 1252(g) does not strip the Court of jurisdiction with respect to plaintiff's eighth claim.

### B. Article III Standing

The federal defendants argue that plaintiff fails to allege facts sufficient to support Article III standing. Mot. at 12. The federal defendants first argue that plaintiff "has admitted that the true target of her claims are the non-federal defendants." Id. The federal defendants argue that, in contrast, plaintiff "fails . . . to establish any injury traceable to actions or omissions of the [f]ederal [d]efendants." Id. at 13. Finally, the federal defendants argue that the Court cannot grant plaintiff the relief she seeks, referencing their earlier arguments with respect to Cheney and Section 1252(g). See id.

In opposition, plaintiff argues that she meets the standing requirements. See Opp. at 24-28. Plaintiff argues that, like in FEC v. Akins, 524 U.S. 11 (1998), plaintiff has standing to assert an informational injury here. See id. at 25. Plaintiff argues that she has been "deprived . . . of information she was statutorily entitled to" given the federal defendants' failure to terminate AGRC for failing to comply with the annual fee requirement. Id. at 26. Plaintiff also argues that federal defendants have failed to sanction AGRC for AGRC's failure to comply with the annual statement requirement. Id. Accordingly, plaintiff argues that she "suffered the loss of the statutorily guaranteed

opportunity to reinvest her money to obtain permanent residency status” or “maintain her eligibility under the EB-5 program.” Id. at 26-27. Next, plaintiff argues that the injury is traceable to the federal defendants. Id. at 27-28. Finally, plaintiff argues that the injury is redressable because the relief sought would “trigger[] the statutory requirement to permit [plaintiff] to reinvest her money with a new regional center.” Id.

In reply, the federal defendants argue that plaintiff makes “the nonsensical argument that she was entitled to know about a sanction, debarment, or termination of non-federal defendants that has not yet occurred.” Reply at 13. The federal defendants further argue that Akins is distinguishable from the instant matter because the holding only applies “where a statute requires that the information ‘be publicly disclosed’ and there otherwise ‘is no reason to doubt [plaintiffs’] claim that the information would help them.’” Id. (quoting Akins, 524 U.S. at 21). The federal defendants further argue that “plaintiff has failed to point to *any* legal right or interest” that pertains to her and instead “impermissibly seek[s] to step into the shoes of a third party” and demand enforcement as to the non-federal defendants. Id. at 14. Finally, the federal defendants argue that plaintiff fails to “cite to *anything* from her [c]omplaint” that gives rise to standing in her opposition. Id. (emphasis in original).

To establish Article III standing, “a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief.” TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). Standing is evaluated on a claim-by-claim basis. See Oregon v. Legal Servs. Corp., 552 F.3d 965, 969 (9th Cir. 2009) (“A plaintiff must demonstrate standing ‘for each claim he seeks to press’ and for ‘each form of relief sought.’”) (quoting DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006)). The party asserting federal jurisdiction bears the burden of pleading and establishing Article III standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 562 (1992). Moreover, standing is evaluated based on “the facts as they exist at the time the complaint was filed.” Thakur v. Trump, 176 F.4th 1187, 1196 (9th Cir. 2026) (quoting Slayman v. FedEx Ground Package Sys., Inc., 765 F.3d 1033, 1047 (9th Cir. 2014)).

Plaintiff alleges that because federal defendants have failed to terminate or debar the non-federal defendants, she has been deprived of the “requisite protections as a [g]ood faith investor . . . providing her 180 days to associate with another regional center

so that she can maintain her legal status in the United States under the EB-5 program." See Compl. ¶¶ 209-212. Plaintiff also alleges that the federal defendants failed to notify her that an EB-5 regional center has been debarred, as required by statute. See id. ¶ 208. Finally, plaintiff alleges that "[t]ime is of the essence as Ms. Liu's current EB-5 visa expires on March 23, 2026." Id. ¶ 12.

First, plaintiff's alleged deprivations with respect to 8 U.S.C. § 1153(b)(5)(M)(i) fail to allege any concrete injury. "To be 'concrete' the injury 'must actually exist,'—that is, it must be 'real' and 'not abstract' or purely 'procedural,'" though "it need not be tangible." Dutta v. State Farm Mut. Auto. Ins. Co., 895 F.3d 1166, 1173 (9th Cir. 2018) (quoting Spokeo, Inc. v. Robins, 578 U.S. 330, 340 (2016)). To determine whether an alleged injury is concrete, courts in the Ninth Circuit ask "(1) whether the statutory provisions at issue were established to protect his concrete interests (as opposed to purely procedural rights), and if so, (2) whether the specific procedural violations alleged in this case actually harm, or present a material risk of harm to, such interests." See Robins v. Spokeo, Inc., 867 F.3d 1108, 1113 (9th Cir. 2017).

Assuming *arguendo* that the statutory provisions are established to protect plaintiff's concrete interest in maintaining her immigration status,[8] the alleged statutory violations present no actual or material risk of harm to such interests. Plaintiff appears to apply circular logic with respect to her alleged deprivation of good faith investor status and notification of the termination of a regional center. Pursuant to 8 U.S.C. § 1153(b)(5)(M)(i), the DHS Secretary "shall notify" EB-5 beneficiaries "*upon the termination or debarment*" of a regional center. 8 U.S.C. § 1153(b)(5)(M)(i) (emphasis added). Pursuant to 8 U.S.C. § 1153(b)(5)(M)(ii), an EB-5 beneficiary's petition or conditional permanent resident status "shall be terminated 180 days *after notification of the termination* from the program . . . unless" the beneficiary makes another qualifying investment. 8 U.S.C. § 1153(b)(5)(M)(ii) (emphasis added). Accordingly, plaintiff's alleged deprivation of the 180-day grace period appears to injure her only to the extent

[8] Courts in the Ninth Circuit have found, for example, that a plaintiff's loss of "an opportunity to maintain their H1-B status" gives rise to an injury-in-fact that satisfies Article III standing requirements. See Potnuru v. U.S. Dep't of Homeland Sec., No. CV-23-02423, 2025 WL 691668, at *4 (D. Ariz. Mar. 4, 2025); Narambatla v. U.S. Dep't of Homeland Sec., No. 2:23-cv-01275, 2024 WL 1659025, at *4 (W.D. Wash. Apr. 17, 2024).

that (1) her regional center has been terminated from the EB-5 program *and* (2) she has been notified of that fact. See id.

Indeed, § 1153(b)(5)(M)(i) provides that "[g]enerally, upon a regional center's termination, an 'otherwise qualified petition . . . or the conditional permanent residence of a[] [noncitizen] . . . shall remain valid or continue to be authorized, as applicable.'" Desai v. Emmel, 821 F. Supp. 3d 1046, 1051 (N.D. Cal. 2026) (quoting § 1153(b)(5)(M)(i)). Accordingly, in the absence of notification, termination alone does not appear to interfere with any "legally protected interest" that plaintiff has in her EB-5 status. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). Instead, the statutory scheme signals the continued validity and authorization of plaintiff's status until termination and notification occur. See § 1153(b)(5)(M)(i).

Plaintiff herself alleges that neither termination nor notification have occurred here. See, e.g., Compl. ¶ 209. Nor is there any indication that termination and notification are imminent—indeed, plaintiff asks the Court to compel the federal defendants to debar or terminate the non-federal defendants. See id. at 44. Accordingly, plaintiff effectively asks the Court to order the condition that would (1) place plaintiff's status at risk of termination under § 1153(b)(5)(M)(ii), (2) trigger entitlement to notification, and, accordingly, (3) trigger the 180-day grace period. In the absence of those conditions, however, plaintiff fails to plausibly allege that any concrete interest is actually harmed or at a material risk of peril with respect to the 180-day grace period.

The plaintiff's appeal to Akins does not compel any other conclusion. First, Akins stands for the "broad rule that "a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." Pub. Int. Legal Found., Inc. v. Nago, 174 F.4th 664, 673-74 (9th Cir. 2026) (quoting Akins, 524 U.S. at 21) ("[T]otal denial of information under a sunshine statute, as in Akins . . . is itself already a concrete injury in fact."), petition for cert. filed on other grounds, No. 26-98 (U.S. July 22, 2026); see also TransUnion LLC v. Ramirez, 594 U.S. 413, 441 (distinguishing Akins, in part because Akins "involved denial of information subject to public-disclosure or sunshine laws that entitle all members of the public to certain information [ . . . ] [t]his case does not involve such a public-disclosure law."). As the federal defendants point out, a statute mandating public disclosure is not at issue here. Moreover, in the context of alleged informational injuries that do *not* derive from public disclosure mandates, the Supreme Court has articulated an "adverse effects" or

“downstream consequences” requirement. See TransUnion LLC, 594 U.S. at 442 (“Moreover, the plaintiffs have identified no ‘downstream consequences’ from failing to receive the required information. . . . An ‘asserted informational injury that causes no adverse effects cannot satisfy Article III.’” (quoting Trichell v. Midland Credit Mgmt., Inc., 964 F.3d 990, 1004 (11th Cir. 2020))). Here, the only “downstream consequence” plausibly pled by plaintiff is her inability to benefit from the 180-day grace period. Accordingly, the fact remains that both the alleged informational injury and adverse effect do not appear to give rise to concrete harm, as discussed above.

Finally, with respect to the alleged expiration of plaintiff's current EB-5 visa on March 23, 2026, the Court fails to perceive how any injury could be traceable to the federal defendants' alleged omissions. To be fairly traceable to the defendants' conduct, “there must be a causal connection between the injury and the conduct complained of.” Dep't of Educ. v. Brown, 600 U.S. 551, 561 (2023) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). “A causation chain does not fail simply because it has several ‘links,’ provided those links are “not hypothetical or tenuous” and remain ‘plausib[le].’” Maya v. Centex Corp., 658 F.3d 1060, 1070 (9th Cir. 2011) (quoting Nat'l Audubon Soc., Inc. v. Davis, 307 F.3d 835, 849 (9th Cir. 2002)).

Here, plaintiff's allegations give rise to no more than speculation that the federal defendants' failure to debar and terminate the non-federal defendants has placed plaintiff's EB-5 visa at risk of expiration. The Court discerns no allegations in the complaint to support the suggestion that plaintiff's EB-5 visa expiration is in any way affected by federal defendants' alleged omissions.[9] While the Court could conceivably speculate as to whether a 180-day grace period pursuant to § 1153(b)(5)(M)(i) might affect the expiration of plaintiff's EB-5 visa on March 23, 2026, the Court declines to do so: “When ‘[s]peculative inferences’ are necessary . . . to establish either injury or the connection between the alleged injury and the act challenged, standing will not be found.” Johnson v. Weinberger, 851 F.2d 233, 235 (9th Cir. 1988) (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 45 (1976)).

---

[9] At the November 9, 2026 hearing, plaintiff's counsel suggested that plaintiff is not able to submit an application with evidence that her investment was creating jobs as a result of the federal defendants' omissions. However, plaintiff's counsel did not identify, nor does the Court discern, any allegations in the complaint that give rise to that inference.

Accordingly, the Court finds that plaintiff has failed to establish Article III standing. Given plaintiff's lack of standing, the Court does not reach the merits of the federal defendants' motion to dismiss for failure to state a claim.

**C. Leave to Amend**

The federal defendants argue that leave to amend should not be granted because "[p]laintiff previously was granted—*and thereafter declined*—the opportunity to amend her claims against the [f]ederal [d]efendants." See Mot. at 15 (emphasis in original) (citing the Court's May 27, 2026 Order granting plaintiff leave to file a first amended complaint, Dkt. 42). The federal defendants further argue that with respect to plaintiff's leave to file a first amended complaint, plaintiff's counsel had represented that

> he was aware of the pleading defects plaguing the claims against the federal defendants, that the federal defendants were not the real target of plaintiff's claims (the non-federal defendants were), and admitted that plaintiff had brought claims against the federal defendants simply to try and garner attention to the complaints she was submitting directly to the relevant agencies regarding the non-federal defendants.

See Mot. at 4 (citation modified). Accordingly, the federal defendants argue that leave to amend would be "futile." Id. at 16. As relevant here, the federal defendants also argue that "[p]laintiff cannot allege facts . . . establishing standing . . . because the lack of injury, causation, or redressability are consequent from the central basis of such claims." Id. at 17.

Plaintiff does not request leave to amend or otherwise address federal defendants' arguments on the topic. See Opp.; Reply at 15.

Because plaintiff (1) does not request leave to amend, (2) has already had the opportunity to amend her complaint, see Dkt. 42, and (3) does not appear to be able to "cure the [complaint's] deficiency," see Schreiber, 806 F.2d at 1401, the Court declines to grant leave to amend. See Berent v. City of Surprise, No. CV-25-02870, 2026 WL 1011186, at *7 (D. Ariz. Apr. 14, 2026) ("Because the Court has already afforded Plaintiff an opportunity to cure the defects in her complaint, and Plaintiff does not request leave to amend her complaint again, the Court will dismiss [the complaint] without prejudice.").

## V. CONCLUSION

In light of the foregoing, the Court **GRANTS** the federal defendants' motion to dismiss.

To the extent that plaintiff asserts her sixth claim for relief on the theory that non-federal defendants submitted annual statements containing "untrue statement[s] of material fact," the claim is dismissed with prejudice. See 8 U.S.C. § 1153(b)(5)(G)(iii)(I)(aa). To the extent that plaintiff asserts her sixth claim for relief on the theory that non-federal defendants "fail[ed] to submit an annual statement," the claim is dismissed without prejudice. See 8 U.S.C. § 1153(b)(5)(G)(iii)(I).

Plaintiff's seventh and eighth claims are dismissed without prejudice.

IT IS SO ORDERED.

| | 00 : 11 |
|---|---|
| Initials of Preparer | CMJ |